UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                Plaintiff,

    v.                                                                  **DECISION AND ORDER**
                                                                                        22-CV-243S

SUZANNE J. WEATHERS,

                Defendant.

## I.      INTRODUCTION

In this fraudulent-conveyance action, the United States of America ("the government") seeks a money judgment against Suzanne J. Weathers equal to the value of Pierre Broquedis's interest in real property located at 77 Nottingham Terrace in Buffalo, New York, as of the date of the alleged fraudulent conveyance.

Now pending is Weathers's motion to dismiss the complaint pursuant to Rules 12 (b)(1) and (6) of the Federal Rules of Civil Procedure.[1]  (Docket No. 8.)  For the reasons set forth below, Weathers's motion is granted in part and denied in part.

## II.      BACKGROUND

This Court assumes the truth of the following factual allegations contained in the complaint.  See Hosp. Bldg. Co. v. Trs. of Rex Hosp., 425 U.S. 738, 740, 96 S. Ct. 1848, 48 L. Ed. 2d 338 (1976); see also Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton Coll., 128 F.3d 59, 63 (2d Cir. 1997).

---

[1] In support of her motion to dismiss, Weathers filed the Declaration of Spencer Durland, Esq. (with exhibit), a memorandum of law, and a reply memorandum of law.  (Docket Nos. 8-1, 8-2, 15.)  The government filed a memorandum of law in opposition.  (Docket No. 12.)

A.      **Pierre Broquedis's Tax-related Liabilities**

Pierre Broquedis, now deceased, had a longtime personal relationship with Weathers.  See Complaint, Docket No. 1, ¶¶ 37, 38, 55 (a), 68 (a).  Broquedis incurred tax-related liabilities over the years that the government seeks to partially collect by recovering the value of his interest in 77 Nottingham Terrace, a residence he shared with Weathers.  Id. ¶¶ 6, 10, 36.

Spanning 45 years or so, Broquedis held several foreign financial accounts in France and Switzerland.  Id. ¶¶ 11-16.  Broquedis filed federal tax returns from 2001 through 2009, but failed to disclose the existence of his foreign accounts and failed to report his dividends or gains/losses generated by those accounts.  Id. ¶ 18.  Broquedis also failed to file Reports of Foreign Bank Accounts during this same time period, which would have reported to the IRS his financial interest or authority over any foreign accounts.  Id. ¶ 17.

In 2011, the IRS launched the 2011 Offshore Voluntary Disclosure Initiative ("OVDI") to encourage federal taxpayers to disclose previously unreported offshore accounts, assets, investments, and income.  Id. ¶ 19.  The IRS required OVDI applicants to submit a packet of information, to include Reports of Foreign Bank Accounts that disclosed foreign accounts and tax returns that reported any previously unreported income.  Id. ¶ 20.  Accepted OVDI applicants paid reduced penalties, depending on the severity of their noncompliance.  Id. ¶ 19.

Broquedis applied to enter the OVDI by submitting a voluntary disclosure letter to the IRS, signed June 6, 2010.  Id. ¶ 21.  This was the first time Broquedis disclosed his foreign accounts to the government.  Id.   The IRS notified Broquedis that it was

preliminarily accepting his voluntary disclosure by letter dated August 4, 2010.  Id. ¶ 22.

Just over one year later, on August 24, 2011, Broquedis submitted Reports of Foreign

Bank Accounts for 2003-2010 and amended tax returns for 2003-2009 as part of his OVDI

disclosure packet.  Id. ¶ 23.  This was the first time Broquedis reported income from his

foreign accounts to the government.  Id.

In February 2012, the IRS opened an income tax examination of Broquedis for tax

years 2005-2009.  Id.  ¶ 24.  Nine months later, Broquedis opted out of the OVDI.  Id. ¶

25.  When he did so, the IRS advised him of the potential penalties that he could face in

connection with his foreign accounts.  Id. ¶ 26.

On September 8, 2016, nearly four years after he opted out of the OVDI, the IRS

proposed willful penalty assessments against Broquedis for tax years 2007-2009 for his

failure to file Reports of Foreign Bank Accounts ("FBAR penalties").  Id. ¶ 27.  One month

later, the IRS notified Broquedis of proposed income tax assessments for tax years 2005-

2009.  Id. ¶ 29.  Broquedis appealed both proposed assessments to the IRS Appeals

Office and subsequently requested that his appeals be adjourned to June 2017.  Id. ¶¶

28, 30, 31.

The IRS Appeals Office ultimately sustained the proposed assessments.  Id. ¶¶

32, 33.  Thereafter, on May 3, 2018, the Secretary of the Treasury timely assessed FBAR

penalties against Broquedis under 31 U.S.C. § 5321.  Id. ¶ 32.  The IRS also issued

notices of deficiency for the income tax assessments.  Id. at 33.

On October 14, 2020, the government secured a judgment against Broquedis in

the amount of $1,168,287.39, plus interest.  Id. ¶ 6.  The judgment consists of the FBAR

penalties and assessments imposed on Broquedis under 31 U.S.C. § 5321 (a)(5) for

3

calendar years 2007, 2008, and 2009.  Id. ¶ 5.  About one month later, on November 23, 2020, the IRS made income tax and accuracy-related penalty assessments against Broquedis for 2005-2009 in the amount of $239,902.30, plus interest running from January 14, 2022.  Id. ¶¶ 10, 36.

## B.   Pierre Broquedis's Transfer of Assets

Broquedis and Weathers acquired 77 Nottingham Terrace for their primary residence on October 8, 1986, as tenants-in-common.  Id. ¶¶ 41, 42.  Ten years later, on October 23, 1996, they converted their ownership interests from tenants-in-common to joint tenants with the right of survivorship.  Id. ¶ 43 and Exhibit A (deed).

On April 20, 2017, at the age of 90, Broquedis transferred his interest in 77 Nottingham Terrace to Weathers for $1 and reserved a life estate for himself ("the 2017 transfer").  Id. ¶¶ 44, 46.  Weathers was aware of and accepted this transfer, as evidenced by her signature on a Real Property Transfer Report (RP-5217).  Id. ¶ 45.  This report listed Weathers as the "purchaser," and it was recorded with the deed.  Id.  The report reflects a full sale price of $1, with a total assessed value of $494,200.  Id.

The government maintains that the 2017 transfer was a fraudulent conveyance. Broquedis knew at the time that he had incurred debts for FBAR penalties and past due income taxes beyond his ability to pay, and the transfer occurred just 14 days after Broquedis requested that the IRS Appeals Office adjourn his appeals to June 2017.  Id. ¶¶ 47, 49.  The adjournment allowed Broquedis to divest himself of his interest in 77

4

Nottingham Terrace before the IRS could assess FBAR penalties and income tax liabilities and before it could obtain enforceable liens.[2]  Id. ¶ 48.

### III.   DISCUSSION

The government asserts four causes of action relating to the 2017 transfer.  The first cause of action alleges fraudulent transfer under the Federal Debt Collection Procedures Act ("FDCPA"[3]), 28 U.S.C. § 3304.  See Complaint, ¶¶ 52-58.  The second cause of action alleges constructive fraudulent conveyance under New York Debtor and Creditor Law ("NY DCL") § 273.[4]  Id. ¶¶ 59-64.  The third cause of action alleges actual fraudulent conveyance under NY DCL § 276.  Id. ¶¶ 65-69.  The fourth cause of action, mislabeled in the complaint as "Count V", seeks attorney fees under NY DCL § 276-a or surcharge under 28 U.S.C. § 3011.  Id. ¶¶ 70-74.

For the first three causes of action, the government seeks a money judgment equal to one-half of the value of 77 Nottingham Terrace, as of the date of the 2017 transfer, or alternatively, a constructive trust in its favor over an undivided 50% interest in the property.  Id. ¶¶ 57, 58, 64, 69.  Notably, the government does not seek to set aside the fraudulent transfer, but rather, seeks a money judgment on the theory that the fraudulent conveyance hindered and delayed it from enforcing its liens before Broquedis's death.

---

[2] The government also alleges that Broquedis fraudulently conveyed $1,782,016 to his daughters, and it has filed a separate suit against them.  See Complaint, ¶ 50; United States v. Marsha Josephine Broquedis & Marie Madeline Ciliberto, 22-CV-194 (GWC).

[3] Not to be confused with the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692 et seq.

[4] The version of the NY DCL applicable here has been repealed.  See Ray v. Ray, 799 F. App'x 29, 31 n. 1 (2d Cir. 2020) (summary order) (recognizing change in NY DCL provisions); see Complaint, ¶ 60 n.2.  But because the allegedly fraudulent conveyance at issue predates the April 4, 2020 effective date of the new provisions, the now-repealed version governs.  See Deerbrook Ins. Co. v. Mirvis, No. 20-1385, 2021 WL 4256845, at *1-2, 5 (2d Cir. Sept. 20, 2021) (summary order) (applying previous version of NY DCL to 2015 conveyance).  All citations herein are therefore to the previous version of the statute, a copy of which can be found in the record at Docket No. 8-1.

Weathers moves to dismiss the complaint for lack of subject-matter jurisdiction and for failure to state a claim upon which relief can be granted.  See Fed. R. Civ. P. 12 (b)(1) and (6).  The government opposes the motion.

## A.    Subject-matter Jurisdiction

Weathers challenges subject-matter jurisdiction on standing grounds.  She argues that the government lacks constitutional standing because it does not plead an injury fairly traceable to the 2017 transfer.  The government maintains that it has sufficiently pleaded an injury for standing purposes.

The party seeking to invoke the court's jurisdiction bears the burden of demonstrating proper subject-matter jurisdiction.  See McNutt v. Gen. Motors Acceptance Corp., 298 U.S. 178, 189, 56 S. Ct. 780, 785, 80 L. Ed. 1135 (1936); Scelsa v. City Univ. of N.Y., 76 F.3d 37, 40 (2d Cir. 1996).  In turn, lack of subject-matter jurisdiction may be raised as a defense under Rule 12 (b)(1) of the Federal Rules of Civil Procedure, which permits dismissal of an action if the "district court lacks the statutory or constitutional power to adjudicate it."  Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000); see also Morrison v. Nat'l Austl. Bank Ltd., 547 F.3d 167, 170 (2d Cir. 2008).

Where lack of constitutional standing is asserted as the jurisdictional defect, the motion is properly brought under Rule 12 (b)(1).  See McKay v. New York, 16-CV-6834-FPG, 2018 WL 1046792, at *2 (W.D.N.Y. Feb. 26, 2018) (citing All. for Envtl. Renewal, Inc. v. Pyramid Crossgates Co., 436 F.3d 82, 87-88 n.6 (2d Cir. 2006)).  "When the Rule 12 (b)(1) motion is facial, i.e., based solely on the allegations of the complaint or the complaint and exhibits attached to it . . . , the plaintiff has no evidentiary burden."  Carter v. Healthport Techs., LLC, 822 F.3d 47, 56 (2d Cir. 2016).  The court's task is simply "to

determine whether the [complaint] 'allege[s] facts that affirmatively and plausibly suggest that [the plaintiff] has standing to sue.'" Id. (citation omitted).  In making this determination, the court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." Warth v. Seldin, 422 U.S. 490, 501, 95 S. Ct. 2197, 2205, 45 L. Ed. 2d 343 (1975).

Constitutional standing derives from Article III of the Constitution, which limits "judicial power" to actual "cases" and "controversies."  U.S. Const. art. III, § 2.  It is a "bedrock constitutional requirement" that is rooted in the traditional understanding of this limitation.  See United States v. Texas, 599 U.S. 670, 675, 143 S. Ct. 1964, 216 L. Ed. 2d 624 (2023); Spokeo, Inc. v. Robins, 578 U.S. 330, 338, 136 S. Ct. 1540, 194 L. Ed. 2d 635 (2016).

As Spokeo explains, constitutional standing developed "to ensure that federal courts do not exceed their authority as it has been traditionally understood" by limiting "the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong."  578 U.S. at 338; see also Warth, 422 U.S. at 498 ("In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues.").  Thus, there must be standing to sue in every federal case.  See Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 11, 124 S. Ct. 2301, 2308, 159 L. Ed. 2d 98 (2004).

The "irreducible constitutional minimum" of standing requires three elements. Lujan v. Defs. of Wildlife, 504 U.S. 555, 560, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable

judicial decision." Spokeo, 578 U.S. at 338 (citing Lujan, 504 U.S. at 560-61); see also TransUnion LLC v. Ramirez, 594 U.S. 413, 423, 141 S. Ct. 2190, 210 L. Ed. 2d 568 (2021); Harty v. W. Point Realty, Inc., 28 F.4th 435, 442 (2d Cir. 2022).

As the party invoking federal jurisdiction, the government bears the burden of establishing these elements for each claim.[5] See FW/PBS, Inc. v. Dallas, 493 U.S. 215, 231, 110 S. Ct. 596, 107 L. Ed. 2d 603 (1990). It meets this burden at the pleading stage by alleging facts demonstrating each element. See Spokeo, 578 U.S. at 338 (citing Warth, 422 U.S. at 518). In this regard, "general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [it is presumed] that general allegations embrace those specific facts that are necessary to support the claim.'" Lujan, 504 U.S. at 561 (citation omitted) (alteration added).

When assessing constitutional standing, courts do not examine the merits of the claims, but rather, determine "whether the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." Warth, 422 U.S. at 498-99. Standing is therefore determined "irrespective of the merits of [the] substantive claims." Bordell v. Gen. Elec. Co., 922 F.2d 1057, 1060 (2d Cir. 1991); Warth, 422 U.S. at 500 ("standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal").

### 1. The government sufficiently alleges an injury-in-fact.

---

[5] Standing is claim-specific. That is, a party must have standing for each claim pursued. See TransUnion LLC v. Ramirez, 594 U.S. 413, 431, 141 S. Ct. 2190, 210 L. Ed. 2d 568 (2021) ("And standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages).”); Cacchillo v. Insmed, Inc., 638 F.3d 401, 404 (2d Cir. 2011) (noting that a plaintiff "must demonstrate standing for each claim and form of relief sought") (quoting Baur v. Veneman, 352 F.3d 625, 642 n. 15 (2d Cir. 2003)).

An injury-in-fact is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." Lujan, 504 U.S. at 560 (internal citations omitted); Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139, 149, 130 S. Ct. 2743, 177 L. Ed. 2d 461 (2010). A "concrete" injury is one that is "'de facto'[,] that is, it must actually exist . . . [it is] 'real' and not 'abstract,'" although an injury need not be tangible to be concrete. Spokeo, 578 U.S. at 340. To be "particularized," an injury "must affect the plaintiff in a personal and individual way." Lujan, 504 U.S. at 560 n.1; see also Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc., 454 U.S. 464, 472, 102 S. Ct. 752, 70 L. Ed. 2d 700 (1982) (noting that the plaintiff must personally suffer an actual or threatened injury).

Here, the government alleges that, as a judgment creditor of Pierre Broquedis, it suffered an injury when, on April 20, 2017, Broquedis transferred (and Weathers accepted) his interest in 77 Nottingham Terrace, reserving for himself only a life estate. Complaint, ¶¶ 7, 44, 45. This conduct is injurious, pleads the government, because it was intended to and has impaired its ability to collect on Broquedis's debt. Id. ¶¶ 56, 67, 72. Specifically, the government alleges that "[b]ut for the transfers, during [Broquedis's] lifetime, the government *would* have had a tax lien on [77 Nottingham Terrace] for the income taxes and a judgment lien for the FBAR penalties and may have recognized the existence of such liens and enforced them before [Broquedis] died." Id. ¶ 56 (emphasis added). In addition, the government alleges that "but for the fraud, the United States could have sold [77 Nottingham Terrace] during [Broquedis's] lifetime and received one half of the proceeds." Id. ¶ 58.

Weathers first argues that the government's allegations that it "may have" or "could have" acted against the property before Broquedis's death are too conclusory to satisfy its pleading obligations.  This Court disagrees.  Assuming the truth of the government's allegations, Broquedis intentionally delayed his administrative proceedings so that he could divest himself of assets before the government could obtain enforceable liens against him.  <u>See</u> Complaint, ¶¶ 48-50.  By fraudulently divesting himself of 77 Nottingham Terrace, the government was unable to levy against the property when it secured its judgment and assessed tax-related penalties during Broquedis's lifetime.  <u>Id.</u> ¶¶ 56, 58.  Accepting these facts as true and drawing all inferences in the government's favor, this Court finds these allegations sufficient to plead an injury-in-fact for standing purposes.

Weathers next argues that the government cannot establish that it suffered an injury-in-fact because the 2017 transfer has no bearing on its present inability to obtain Broquedis's interest in 77 Nottingham Terrace.  In a fraudulent-conveyance action, "a complaining creditor must plead . . . that it had an equity stake in the debtor's assets— that is, that some portion of the debtor's assets would have been available to satisfy the unsecured creditor's claims had there been no conveyance."  <u>Chemtex, LLC v. St. Anthony Enters., Inc.</u>, 490 F. Supp. 2d 536, 542 (S.D.N.Y. 2007).  Absent such an interest, "an unsecured creditor lacks standing to challenge the conveyance as fraudulent."  <u>Id.</u> For example, creditors lack standing to challenge allegedly fraudulent conveyances where other pre-existing encumbrances would consume the asset in any event, leaving no portion available to satisfy the creditors' claims.  <u>See</u> <u>DeVos v. Lee</u>, No. 07-CV-804, 2010 WL 277070, at *2 (E.D.N.Y. Jan. 19, 2010) (collecting cases for the proposition that

a "creditor may not maintain a fraudulent conveyance claim where the transferred property is encumbered by sufficient prior liens such that the creditor-plaintiff would not be entitled to reach any portion of the property if the conveyance were set aside").

Weathers maintains that the government was not injured by the 2017 transfer because it is Broquedis's intervening death, not the 2017 transfer, that prevents the government from now reaching Broquedis's interest in the property. As Weathers's argument goes, Broquedis's death triggered Weathers's right of survivorship, leaving no portion of 77 Nottingham Terrace for the government to collect. That is, even if Broquedis's pre-transfer joint-tenancy interest in the property could be restored, the government cannot now reach it because Broquedis's subsequent death extinguished that interest and caused the whole of the property to reside with Weathers pursuant to her right of survivorship.[6] See Trotta v. Ollivier, 933 N.Y.S.2d 66, 69 (N.Y. App. Div. 2011) ("The right of survivorship has been defined as 'a right of automatic inheritance' where, upon the death of one joint tenant, the property does not pass through the rules of intestate succession, but is automatically inherited by the remaining tenant." (quoting United States v. Craft, 535 U.S. 274, 280, 122 S. Ct. 1414, 152 L. Ed. 2d 437 (2002)). As a result, argues Weathers, there exists no portion of the property available for recovery.

The question at this stage, however, is only whether the government has adequately pleaded an injury-in-fact, without forecasting its likelihood of success. See Bordell, 922 F.2d at 1060 (noting that standing is determined without regard to the merits of the substantive claims). The government maintains that it has plausibly pleaded that some portion of Broquedis's interest in 77 Nottingham Terrace would have been available

---

[6] New York law defines the property interests for purposes of both the federal and state claims. See Exp.-Imp. Bank of U.S. v. Asia Pulp & Paper Co., 609 F.3d 111, 117 (2d Cir. 2010).

for collection before his death but for the 2017 transfer.  See Chemtex, 490 F. Supp. 2d at 542.  It argues that a partition action could have been brought, for example, to realize half of the property's value.  Sale to a third party may also have preserved Broquedis's interest in the property, by severing the right of survivorship without the need for a partition action. See, e.g., Prario v. Novo, 645 N.Y.S.2d 269, 271 (N.Y. Sup. Ct. 1996) (discussing that the right of survivorship created by a joint tenancy "can be changed by conveyance or partition without the assent of other joint tenants").  In short, the government argues that Broquedis, as a joint tenant, held an interest in 77 Nottingham Terrace that it could have levied against before his death if not for the 2017 transfer, a point that Weathers recognizes.  See Reply Memorandum of Law, Docket No. 15, p. 7[7] (recognizing that before Broquedis's death, the government's inability to levy against his joint-tenancy interest was fairly traceable to the 2017 transfer because "voiding the 2017 transfer and restoring the preexisting joint tenancy would enable the government to levy against Mr. Broquedis's joint-tenancy interest").

Having considered the parties' arguments, this Court finds that the government has sufficiently pleaded an injury-in-fact to survive Weathers's motion to dismiss. Although the parties dispute whether the government could realistically have acted against the property before Broquedis's death—the government maintains, for example, that a partition action could have been brought to realize half of the property's value or a lien-enforcement suit initiated—that is a factual, merits-based inquiry.  Moreover, Weathers's arguments principally address the impossibility of setting aside the transfer and returning to the *status quo ante*, but the government expressly seeks a money

---

[7] Page citations are to the page numbers generated by the court's electronic filing system.

judgment or constructive trust, not a return to the *status quo ante*.  Consequently, this Court finds that the government's complaint plausibly alleges that it suffered an injury-in-fact as a result of the 2017 transfer.  See Lujan, 504 U.S. at 561 (noting that general factual allegations of injury may suffice at the motion-to-dismiss stage).

### 2.  The government sufficiently alleges traceability.

"The traceability requirement for Article III standing means that the plaintiff must demonstrate a causal nexus between the defendant's conduct and the injury."  Chevron Corp. v. Donziger, 833 F.3d 74, 121 (2d Cir. 2016) (internal quotation marks and citation omitted).  This standard is not onerous.  See Ateres Bais Yaakov Acad. of Rockland v. Town of Clarkstown, 88 F.4th 344, 352-53 (2d Cir. 2023).  "It requires no more than *de facto* causality, a standard that is, of course, lower than for proximate causation."  Id. at 353 (citations omitted).  For example, "[a] defendant's conduct that injures a plaintiff but does so only indirectly, after intervening conduct by another person, may suffice for Article III standing."  Carter, 822 F.3d at 55-56.

The injurious conduct here is the 2017 transfer that prevented the government from levying on 77 Nottingham Terrace during Broquedis's lifetime.  The government alleges that both Broquedis and Weathers acted to cause that injury.  For example, the government alleges that Broquedis, knowing that he had incurred tax-related debts beyond his ability to pay, intentionally divested himself of 77 Nottingham Terrace and more than $1.7 million before the IRS could assess the FBAR penalties and income tax liabilities against him, and before it could obtain liens that would have been enforceable against his interest in the property.  Complaint, ¶¶ 26, 48-50.  And it further alleges that Weathers was aware of and accepted the transfer and, on information and belief, "was

complicit in the effort to move [77 Nottingham Terrace] out of Broquedis's name before the tax liens or judgment lien were expected to eventually arise.  Id. ¶¶ 45, 72.  These allegations plausibly allege traceability.

### 3.  The government sufficiently alleges redressability.

The final element of standing requires that the injury traceable to the defendant's conduct is likely to be redressed by a favorable judicial decision.  Spokeo, 578 U.S. at 338.  "A plaintiff makes this showing when the relief sought 'would serve to . . . eliminate any effects of' the alleged legal violation that produced the injury in fact."  Soule v. Conn. Assoc. of Schs., Inc., 90 F.4th 34, 47 (2d Cir. 2023) (en banc) (quoting Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 105-06, 118 S. Ct. 1003, 140 L. Ed. 2d 210 (1998)).  Here, the government alleges that a money judgment or constructive trust will allow it to recover the value of Broquedis's interest in the property.  Complaint, ¶¶ 57, 58, 64, 69.  Although Weathers contends that a money judgment is not an available remedy (discussed below), this Court finds the government's allegations sufficient to allege redressability at the pleading stage.

*   *   *

For the reasons stated above, this Court finds that the government has sufficiently and plausibly alleged constitutional standing to sue.  Weathers's motion to dismiss for lack of subject-matter jurisdiction is therefore denied.

### B.    Failure to State a Claim

Weathers argues that the government's complaint must be dismissed for failure to state a claim upon which relief can be granted because the requested relief—a money judgment or imposition of a constructive trust—is unavailable under the statutes at issue.

The government argues that both the state and federal statutory schemes allow for the requested relief.

Rule 12 (b)(6) of the Federal Rules of Civil Procedure allows dismissal of a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12 (b)(6).  The rule is "designed to test the legal sufficiency of the complaint, and thus does not require the Court to examine the evidence at issue." DeJesus v. Sears, Roebuck & Co., 87 F.3d 65, 69 (2d Cir. 1996).  The question, rather, is whether the complaint meets the applicable pleading standards.  See Berry v. Tremblay, 9:20-CV-177 (DNH/TWD), 2021 WL 1575951, at *2 (N.D.N.Y. Apr. 22, 2021) ("The [Rule 12 (b)(6)] motion tests the legal sufficiency of the complaint and whether it conforms to Rule 8 (a)(2) of the Federal Rules of Civil Procedure.").

Federal pleading standards are generally not stringent: Rule 8 requires only a short and plain statement of a claim.  Fed. R. Civ. P. 8 (a)(2).  But the plain statement must "possess enough heft to show that the pleader is entitled to relief." Bell Atl. Corp. v. Twombly, 550 U.S. 554, 557, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007).  When determining whether a complaint states a claim, the court must construe it liberally, accept all factual allegations as true, and draw all reasonable inferences in the plaintiff's favor. See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).  Legal conclusions, however, are not afforded the same presumption of truthfulness.  See Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) ("the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions").

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 570).  Labels, conclusions, or "a formulaic recitation of the elements of a cause of action will not do."  Twombly, 550 U.S. at 555.  Facial plausibility exists when the facts alleged allow for a reasonable inference that the defendant is liable for the misconduct charged.  Iqbal, 556 U.S. at 678.  The plausibility standard is not, however, a probability requirement: the well-pleaded allegations in the complaint need only nudge the claim "across the line from conceivable to plausible."  Twombly, 550 U.S. at 570.

A two-pronged approach is thus used to examine the sufficiency of a complaint.  This examination is context specific and requires the court to draw on its judicial experience and common sense.  See Iqbal, 556 U.S. at 679.  First, statements that are not entitled to the presumption of truth, such as conclusory allegations, labels, and legal conclusions, are identified and stripped away.  See id.  Second, well-pleaded, non-conclusory factual allegations are presumed true and examined to determine whether they "plausibly give rise to an entitlement to relief."  Id.  "Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint fails to state a claim.  Id.

In considering a motion to dismiss under Rule 12 (b)(6), "a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken."  Leonard F. v. Isr. Disc. Bank of N.Y., 199 F.3d 99, 107 (2d Cir. 1999) (quotation marks omitted); see also Blue Tree Hotels Inv. (Can.), Ltd.

v. Starwood Hotels & Resorts Worldwide, Inc., 369 F.3d 212, 217 (2d Cir. 2004).  "[W]here a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect," thereby rendering the document "integral to the complaint."  Mangiafico v. Blumenthal, 471 F.3d 391, 398 (2d Cir. 2006) (citing Chambers v. Time Warner, Inc., 282 F.3d 147, 152–53 (2d Cir. 2002)).  But even where a document is "integral" to the complaint, it cannot serve as the basis for dismissal unless there is no dispute as to its authenticity, accuracy, and relevance.  See Faulkner v. Beer, 463 F.3d 130, 134 (2d Cir. 2006) (internal citations omitted).

### 1.   The government sufficiently states a claim under the Federal Debt Collection Procedures Act.

The government brings its first cause of action under the FDCPA.  It alleges fraudulent transfer under 28 U.S.C. § 3304, and it seeks as a remedy a money judgment under 28 U.S.C. §§ 3306 and 3307 equal to one-half the value of Broquedis's share of 77 Nottingham Terrace or a constructive trust in its favor as to an undivided 50% interest in the property.  Complaint, ¶¶ 52-58.

The FDCPA "provides the exclusive civil procedures for the United States to recover a judgment on a debt."  28 U.S.C. § 3001 (a)(1).  The statute was enacted "to create a comprehensive statutory framework for the collection of debts owed to the United States government" and "to improve the efficiency and speed in collecting those debts." N.L.R.B. v. E.D.P. Med. Comput. Sys., Inc., 6 F.3d 951, 954 (2d Cir. 1993) (citing the Congressional record).  The statute does not, however, create any interests or rights in property.  Exp.-Imp. Bank of U.S. v. Asia Pulp & Paper Co., Ltd., 609 F.3d 111, 117 (2d Cir. 2010).  Rather, "state law generally governs the nature of any interests in or rights to property that an entity may have."  Id.  In short, "the FDCPA itself creates no property

rights but merely attaches consequences, federally defined, to rights created under state law." Id. (quotation marks and citations omitted).

Remedies for fraudulent transfer available to the United States are set out as follows:

> **In general.** --In an action or proceeding under this subchapter for relief against a transfer or obligation, the United States, subject to section 3307 and to applicable principles of equity and in accordance with the Federal Rules of Civil Procedure, may obtain--
>
> (1) avoidance of the transfer or obligation to the extent necessary to satisfy the debt to the United States;
>
> (2) a remedy under this chapter against the asset transferred or other property of the transferee; or
>
> (3) any other relief the circumstances may require.

28 U.S.C. § 3306 (a).

Along with its factual allegations concerning the fraudulent transfer itself, the government alleges that "[u]nder [2]8 U.S.C. § 3306, the United States is not limited to avoidance of the transfer but may alternatively seek any other relief that the circumstances may require."  Complaint, ¶ 57 (alterations added).  It further alleges that "[u]nder § 3307, the United States is entitled to recover judgment for the value of the asset transferred."[8]  Id.

Weathers seeks dismissal of the government's FDCPA claim on the basis that the FDCPA authorizes money judgments only when property has been dissipated or

---

[8] This Court notes without deciding that § 3307 (b) appears inapplicable because the government does not seek to avoid the 2017 transfer.  See 28 U.S.C. § 3307 (b) (providing that "*to the extent a transfer is voidable in an action or proceeding by the United States under section 3306 (a)(1)*, the United States may recover judgment for the value of the asset transferred, but not to exceed the judgment on a debt") (emphasis added).

encumbered after its fraudulent transfer.  In Weathers's view, 28 U.S.C. § 3306 authorizes only those remedies that unwind fraudulent transfers and restore the *status quo ante*, because it is the reading most aligned with the statutory scheme.  Weathers thus argues that the money judgment the government seeks is unavailable, because any such judgment would effectively improve its position beyond the *status quo ante* by diminishing her right of survivorship.  The government maintains that its demand for a money judgment is plainly authorized under §§ 3306 and 3307.  Having considered the parties' arguments, this Court finds that the government sufficiently states a plausible claim under the FDCPA.

First, Weathers recognizes that the FDCPA's list of remedies includes the catchall "any other relief the circumstances may require."  28 U.S.C. § 3306 (a)(3).  She argues, however, that each of the remedies set forth in the FDCPA must be understood to allow only relief that would restore, but not exceed, the *status quo ante*.  See, e.g., United States v. Resnick, 594 F.3d 562, 570 (7th Cir. 2010) (characterizing § 3306 as "simply allow[ing] the court to order that the transfer be unwound").  And she further argues that money judgments are authorized to restore the *status quo ante* only if post-transfer dissipation or encumbrance has occurred.  See United States v. Septon, No. 14-CV-1139, 2016 WL 3030237, at *6 (D. Minn. May 26, 2016); United States v. Pritchett, No. 5:09-CV-322-F, 2011 WL 197763, at *11 (E.D.N.C. Jan. 20, 2011); United States v. Sherrill, 626 F. Supp. 2d 1267, 1275 (M.D. Ga. 2009).

Notably, however, the cases upon which Weathers relies are from the trial (Sherrill) or summary-judgment stages (Septon and Pritchett), not the motion-to-dismiss stage.  And while those cases involve money judgments in the context of post-transfer

diminutions of property, Weathers offers no authority holding that money judgments are *precluded* as a matter of law absent those circumstances.   Moreover, acceptance of Weathers's arguments would require this Court to draw assumptions and inferences in her favor, not the government's, which is prohibited at this stage.[9]   See ATSI Commc'ns, 493 F.3d at 98.   At bottom, this Court cannot conclude at this infant stage that a money judgment under the FDCPA is foreclosed as a matter of law.

In the current posture, this Court finds that the government has plausibly pleaded that a money judgment may be available under the FDCPA to remedy the alleged fraudulent transfer.   The unchallenged factual matter in the complaint, accepted as true, therefore states a claim that is plausible on its face.   See Iqbal, 556 U.S. at 678. Weathers's motion to dismiss the first cause of action is therefore denied.   See Sharikov v. Philips Med. Sys. MR, Inc., 103 F. 4th 159, 166 (2d Cir. 2024) ("A complaint survives a Rule 12 (b)(6) motion to dismiss if the facts, taken as true and with all reasonable inferences drawn in the plaintiff's favor, state a plausible claim to relief.").

**2.      The government fails to state a claim under the New York Debtor and Creditor Law.**

The government brings its second and third causes of action under the NY DCL. It alleges constructive fraudulent conveyance under NY DCL § 273, see Complaint, ¶¶ 59-64, and actual fraudulent conveyance under NY DCL § 276, id. ¶¶ 65-69.   For each claim, the government seeks as a remedy a money judgment under NY DCL § 279 (d) equal to one-half the value of Broquedis's share of 77 Nottingham Terrace or a

---

[9]   Weathers also argues that her interpretation of the FDCPA should be favored over the government's construction to avoid constitutional issues under the Due Process and Takings Clauses.   But this too is merits-based.

constructive trust in its favor as to an undivided 50% interest in the property.  Weathers

argues that the government fails to state a claim because neither requested remedy is

available under NY DCL § 279.

NY DCL § 279 sets out the rights of creditors whose claims have not matured.  It

provides as follows:

> Where a conveyance made or obligation incurred is fraudulent
> as to a creditor whose claim has not matured he may proceed
> in a court of competent jurisdiction against any person against
> whom he could have proceeded had his claim matured, and
> the court may,
>
> a. Restrain the defendant from disposing of his property,
>
> b. Appoint a receiver to take charge of the property,
>
> c. Set aside the conveyance or annul the obligation, or
>
> d. Make any order which the circumstances of the case may
>    require.

NY DCL § 279.

The government alleges in its complaint that "[a]t the time of the 2017 Conveyance,

the debts of the United States, although accrued, had not yet matured within the meaning

of New York law because the United States was not able [to] collect those debts prior to

assessment."  Complaint, ¶ 64.  It further alleges that "under New York law as it read in

2017, the United States is not limited to having the conveyance be set aside but, instead,

may have the Court '[m]ake any order which the circumstances of the case may require.'"

Id. (quoting NY DCL § 279).

Weathers seeks dismissal of both causes of action on the basis that NY DCL §

279 is inapplicable.  She argues that the government's claims had matured at the time it

initiated its lawsuit and, in any event, NY DCL § 279 (d) would not authorize a money

judgment under the facts alleged.  The government does not address Weathers's

arguments, but rather, maintains that a money judgment is authorized under NY DCL § 278—a different section not pleaded in the complaint.  Having considered the parties' arguments, this Court agrees with Weathers that the government's second and third causes of action fail to state claims upon which relief can be granted.

First, the government does not refute Weathers's points as it relates to the inapplicability of NY DCL § 279.  It thus concedes those arguments.  See Curry Mgmt. Corp. v. JPMorgan Chase Bank, N.A., 643 F. Supp. 3d 421, 426 (S.D.N.Y. 2022) ("A party may be deemed to concede an argument by failing to address it in an opposition brief."). This is an independent basis to grant Weathers's request for dismissal of these claims.

Second, as to the merits, this Court agrees with Weathers's assessment that by the government's own allegations, relief under NY DCL § 279 is not available.  Section 279 provides protective remedies when a creditor's claim has not yet been established. See Marine Midland Bank v. Murkoff, 508 N.Y.S.2d 17, 23 (N.Y. App. Div. 1986).  The remedies there are intended to protect the property for the creditor's benefit.  See id. Thus, the statute authorizes interim relief such as restraining the defendant from disposing of the property, appointing a receiver to take charge of the property, and setting aside any conveyance or annulling any obligation pertaining to the property.  See NY DCL § 279 (a)-(c).  But again, this relief applies only to the rights of creditors whose claims have not yet matured.

The government alleges that its claims had not yet matured at the time of the 2017 transfer.  Complaint, ¶ 64.  While this may be true, the relevant inquiry is the state of its claims at the time of suit, not at the time of the allegedly fraudulent conveyance.  See Gortat v. Capala Bros., Inc., 07-cv-3629 (ILG)(SMG), 2018 WL 6718680, at *9 (E.D.N.Y.

Nov. 6, 2018) (rejecting application of § 279 to creditor with matured claim in favor of § 278); <u>Ostashko v. Ostashko</u>, No. 00-CV-7162 (ARR), 2002 WL 32068357, at *26 (E.D.N.Y. Dec. 12, 2002) (granting relief under § 279 to creditor with unmatured claim). A claims is matured at the time it comes due. <u>See</u> <u>Mature</u>, <u>Black's Law Dictionary</u> (11th ed. 2019). And according to the government's own allegations, accepted here as true, its claims became due in 2020, after it secured a judgment and assessed tax penalties against Broquedis. Complaint, ¶¶ 6, 36. The government's claims had thus matured at the time it initially filed suit in 2021. NY DCL § 279 therefore does not apply, rendering the remedy sought unavailable.[10]

Finally, the government's position that a money judgment is authorized under NY DCL § 278 is a nonstarter because its complaint seeks relief under only NY DCL § 279. <u>See</u> Complaint, ¶¶ 64, 69. Since a party is not entitled to amend its complaint through briefing, only the provisions of NY DCL § 279 are properly at issue.[11] <u>See, e.g.</u>, <u>Wright v. Ernst & Young LLP</u>, 152 F.3d 169, 178 (2d Cir. 1998) (rejecting allegations raised in opposition memoranda to a motion to dismiss).

Consequently, because the government seeks a remedy that is unavailable to it, this Court finds that its second and third causes of action must be dismissed for failure to state claims upon which relief can be granted.

---

[10] Because NY DCL § 279 does not apply on its face, this Court offers no opinion as to whether that statute, if applicable, would otherwise authorize the type of money judgment the government seeks.

[11] The parties discuss NY DCL § 278 extensively in their briefs. But since the government seeks no relief under that statute, this Court declines to reach those arguments in the abstract. <u>See</u> <u>United Pub. Workers of Am. (C.I.O.) v. Mitchell</u>, 330 U.S. 75, 89, 67 S. Ct. 556, 91 L. Ed. 754 (1947) ("As is well known the federal courts established pursuant to Article III of the Constitution do not render advisory opinions.").

### C.      Leave to Amend

Given that district courts have broad discretion to grant a party leave to amend its pleadings and the federal rules dictate that courts "freely give leave when justice so requires"  Fed. R. Civ. P. 15 (a)(2); see also Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 230, 9 L. Ed. 2d 222 (1962); Ellis v. Chao, 336 F.3d 114, 127 (2d Cir. 2003), this Court will afford the government the opportunity to amend its NY DCL claims, which are the only claims subject to dismissal.

### IV.      CONCLUSION

For the reasons stated above, this Court finds that Weathers's motion to dismiss the government's complaint for lack of subject-matter jurisdiction under Rule 12 (b)(1) must be denied, because the government has sufficiently pleaded constitutional standing. This Court further finds that Weathers's motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12 (b)(6) must be granted in part and denied in part, because the government has sufficiently pleaded its FDCPA claim (first cause of action), but has failed to state claims under the NY DCL (second and third causes of action).  The government will be granted leave to amend its NY DCL claims.

### V.      ORDERS

IT HEREBY IS ORDERED, that Weathers's motion to dismiss (Docket No. 8) is GRANTED IN PART, and DENIED IN PART, consistent with the foregoing decision.

FURTHER, that the government is afforded leave to amend its NY DCL claims through the filing of an amended complaint within 14 days of the entry date of this decision.

FURTHER, that Weathers must answer the complaint or respond to the amended complaint, if filed, within 28 days of the entry date of this decision.

SO ORDERED.


Dated:          July 16, 2024
                Buffalo, New York


                                              s/William M. Skretny
                                              WILLIAM M. SKRETNY
                                              United States District Judge